The next argued case is number 17, 1976, in Re Verhoef, Mr. Loop. Your honors, if it may please the court. My name is Thomas Loop and I represent the appellate, Jeff Verhoef, in this appeal. We are all here today because Mr. Verhoef believes that he alone is the sole, original, and first inventor of the invention set forth in his patent application filed on December 16, 2011, entitled Dog Mobility Device. Isn't it clear that the figure 8, Loop, was key to the invention and that the veterinarian contributed it? I'm a little bit hard of hearing, isn't it? I'm sorry. Isn't it clear that a key factor, certainly a necessary claim limitation, was the figure 8, Loop, and that the veterinarian contributed that? It is true that the veterinarian, Dr. Alicia Lamb, made a suggestion, and that suggestion was the figure, Loop. And that figure, Loop, is an essential and key part of the claim combination. Therefore, as they perhaps determined originally, there was a joint invention. That application fell abandoned. That's true. That is correct. And he refiled it in his own name. And since it was a joint invention, he did not, under 102F, invent the claim subject matter. Well, that's why we're here. That's what we're trying to kind of resolve. That's what we're trying to get to the bottom of, is whether or not he is the true inventor, or whether or not this alleged co-inventor or alleged collaborator is an inventor. And I'm here to tell a story. I'm here to tell Mr. Verhoef's story about how he came and how he created invention and how it was clandestinely taken from him, how he was misinformed about the law, okay, and how he became more appreciative of the law. And that's why we're here. That's what we're trying to get resolved today. Okay, so I'm going to continue with my script here, and I'm happy to entertain kind of any questions. But we agree that Dr. Lamb made a significant contribution. Mr. Verhoef was consulting with her. His dog, Riley, had surgery, had a degenerative canine myelopathy, which is a very insidious and cruel disease that was afflicting his dog. And so based on the advice of his surgeon, he went to visit Dr. Lamb, to consult with her. And he had a nine-week therapy session for the dog, over nine weeks, and he paid $895 for this. To understand why you're here, you're asking us to act like a board of interferences with these two different patent applications? No, we don't think those are applications. You're asking us to decide, since interferences were abolished, do we know which of these two applications was filed first? I gather that the idea of resolving this debate through some sort of joint invention is not available. What are you asking of this court? We're asking this court to declare Mr. Verhoef to be the sole and true and original inventor of this invention. But he's already agreed that as far as the figure-eight configuration was concerned, that was not his idea. That's correct. So... It wasn't his idea. That idea was given to him. But it's there in his specification that you're asking us to declare... It's in the specification. The Paul Lube contribution is in the specification. And we agree that that idea was given to him by someone else, as in all inventions. There are no claim combination where somebody has... All inventors take limitation and elements from others. That's the essence of inventions. He did nothing else. He was... He had the entire reduction to practice of the invention. He was in the process of reducing his invention to practice. And he... Sarah typically... She blurted out an idea and he adopted it. That's what happened here. She gave an idea. She said that, hey, why don't you try figure-eight? And he did. And so we don't believe. He doesn't believe. And that's why we're here. He doesn't believe that that rises to the high level of being an inventor. That just the mere suggestion of an idea that was freely given. Freely given idea. Just because you give an idea doesn't or shouldn't provide you a high status of being an inventor. Particularly when she had nothing to do with the reduction to practice. Okay? And there's no evidence that she did anything more than provide a suggestion. You know, we don't think that her contribution is significant. We think it's insignificant when you look at the invention as a whole. That's why we're here. So you're right. She made that. And I think that the patent office said it was the piece that solved the puzzle. And a long-ago case that, to my knowledge, still hasn't been overturned is this Morski-Porter. And they say it was the key that unlocked the problem. And we agree with that case. We want this court to adopt that case and have that as a safe harbor under the law of inventorship. You know, we think that would add clarity to the law. Because he could have hired Dr. Lamb as an employee. He could have had a formal employment agreement, and there would be a different result here. You know? And that doesn't seem fair. It doesn't seem that we could have a contract, and then somehow that's going to affect the quality of an inventor. Either you're an inventor or you're not an inventor. So, you know, the question before the court is, what is an inventor? That's what we're trying to settle. He believes that he's the sole original and first inventor. It is true. He first filed a patent application that named him as joint inventor. Because the reason he did so, and it's in his declaration, is because she agreed to pay for the patenting cost. And he thought that she was going to help him with the marketing of the invention. That's what he thought. He was misinformed about the law. He came to my offices. I informed him about the law. I told him about Morski-Porter. It's an important case. It's cited throughout the NPDP. Lots of patent attorneys in the patent bar rely on this case. And it says that if you maintain intellectual domination and control over the work of making the invention, that you're the sole inventor. That's what that case stands for. Now, it's true. It's a 1965 case, and they're thinners, per se. But it hasn't been expressly overruled. If that's what we're going to do, we can do that. And it will add clarity to the law. Because the law is not settled. It's not settled in this area. If we don't have clarity in the law, as a patent attorney, whenever I draft a patent application and I specify a type of polymer or things like that, am I an inventor? I contributed. It was my idea. I don't think so. I view my client as maintaining intellectual domination and control over the process of making the invention. So this is an important case. We also think a public policy to hold otherwise, to deprive Mr. Verhoeff of his invention, has a chilling effect on the free flow of ideas. We want inventors, prospective inventors, to solicit the ideas from others. You want the free flow of ideas. You don't want fear of losing his patent rights because I'm trying to solve a problem. Hey, do you have a good suggestion? You're my friend. You're my consultant. Somebody I think I can trust. Can you help me solve the problem? Well, if we don't declare him to be the inventor, I have to tell all my clients in the patent bar, hey, do things in secrecy. Don't try to solve problems. This is an important case. We want the free flow of ideas. We want people to solve problems. We want to advance the technological arts. We don't want to just stymie inventors because somebody, hey, try this. She had no idea that it was going to work. She had nothing to do with production. So explain, if you would, so these two patent applications are filed on the same day. Exactly. Was the purpose to conduct some sort of derivation proceeding? No. Or to get the office to decide between them? It's just the way that it happened. There was, you know, as background, to put things in context. You know, again, to get back to my story, or I should say Mr. Verhoff's story, he went to the veterinarian clinic. They had a prior art device. It was known as the Beco brace. Okay? And they tried that. They put his dog, who had this insidious canine myelopathy disease, in this underwater treadmill. And they put the prior art device on him. But it didn't solve the problem. He still had this nut clean. So you're saying it was pure chance that these two just about identical applications were filed the same day with different inventors? I won't say it was pure chance. What happened in his way of background is that after meeting with Dr. Lamb in her clinic, and this is, you know, all in the declaration that he swore out, he developed a new and improved dog mobility device. And he decided that he wanted to patent it. So he came and saw a patent attorney. But at that time, he's not informed of the law. Dr. Lamb told him that, look, I'm going to help with the marketing. I'll pay for the patent cost. To him, he doesn't know the law. He thought that seemed reasonable. I'll include her as an inventor. They filed a patent application together. They contemplated a business relationship. But it quickly soured. She lawyered up. The 21 document formation agreements, all these things, it spooked him. He came and saw me and said, what am I going to do? Well, explain to me what happened. It's a story. I went and saw the veterinarian. Had this big problem, trying to kind of solve it. So he took the prior art device, and he decided he could improve upon it. Okay? And that's how he came up with his invention. He made an improvement. And the improvement, he identified the problem. So the problem with the prior art device is that it only assisted with the forward movement of the dog's hind leg. It didn't assist with the upward movement of the dog's toes. Okay? And he realized that during one of these treatment sessions. And he said, and he said to the veterinarian, there has to be a way that, you know, to connect it to the toes. If we can connect it to the toes, we can solve the problem. You know? And she took a dog collar and put it in a loop and said, maybe try this. And so he did that. He went and tried it. And through trial and error, building different prototypes, he eventually achieved actual reductions of practice. So that's what happened. And so they filed in October, a couple months prior, they filed a joint application together. And they both swore that they were joint inventors. They're lay people. They don't know the law of inventorship. It seemed reasonable to them at the time based on their limited understanding of the law. Again, Mr. Verhoeff came into my office. There's a problem here. You know, he told me the story. And I told him that there's this case, Morski-Porter, cited in the NPEP. Lots of patent practitioners rely on this. It says that if you maintain intellectual domination control over the work of making the invention, you're the sole inventor. Notwithstanding the fact that somebody gave you, a hired consultant, a friend, an employee gave you a useful suggestion. So it's an old case. But if that's not the law, I'd like to know. That's why we're here. We need to either put that case to rest and say that it's not good law. Or we need to make a safe harbor and say that, hey, if you're an inventor and somebody freely gives you an idea, you could incorporate it into your invention. And that's how most inventions are made. People don't think of every single limitation of their claims. They always are taking other ideas from other people. That's the essence of invention, is creating something new. And you're always borrowing, you know, from the things that are out there. And that's exactly what the situation we have here. So yes, it's true. The Apollo is a critical feature. But it's not the invention. And there's nothing in the record that shows that she had an invention, Dr. Lamb. All she did, all the evidence shows, is that she gave a suggestion. The invention, the inventor process, as in the record, is entirely attributable to Mr. Vernhoff. I see I'm running a little bit low on time. Yes, you are. Let's hear from the other side, and we'll save the rest of your time. Okay, thank you. Ms. Schoenfeld. May it please the court. This is a clear-cut case of joint inventorship. The PTO is not trying to take away Mr. Vernhoff's patent or discount his contribution. The PTO is merely trying to ascertain— That's not the question. I don't understand what the office is doing in making an inventorship decision. We've abolished interferences so that priority is no longer available to determine. This is not a derivation proceeding. What is it? It is a 102-F rejection. The statute requires— 102-F, but it's not prior art because it's got the same date. Well, based on the earlier application that was filed jointly and the two applications which were filed on the same date, the PTO made the determination that the correct inventorship was not stated on the patent application. Why is the office deciding this inventorship issue? On what basis? Again, it's not an interference because there aren't interferences. It's not a derivation proceeding, although perhaps it should be to resolve a dispute. We're asked to decide who the inventor is. Why is the office issuing a rejection as you're only a joint inventor? And it wasn't prior art, so it can't be based on prior art. It's based on some new theory to me. What is the theory behind this action? As I said, it's a 102-F rejection. So 102-F says that a person can only file a patent application if the correct inventorship is named, if they are the true inventor of the patent. So why are you telling me that the office inquires into the correct inventorship? What, is obliged to inquire as to every patent application that's filed, or what? So when an application is filed, the inventors file a declaration which states that they are the true inventors. And here, in this case, the- Everyone files such a declaration. You're saying there's an obligation on the office to investigate every such declaration, or any such declaration, without conducting either what was an interference or a derivation proceeding, which was a carefully worked out theory as to the sort of inventorship question which is consigned to the office. So- Only derivation, nothing else. Correct, but- So the office is not obligated to conduct an analysis, but here the office had compelling evidence, which Mr. Verhoff himself brought to the attention of the office. He alerted to the office during prosecution of an identical application. When the office saw that someone had filed an identical application, when the office saw that a joint application had been filed together with Dr. Lamb and Mr. Verhoff- Why does that entitle the examiner to say, no, I prefer this inventor over this inventor? The office is not preferring one inventor over the other. The office is saying that the inventorship was not correct when filed in violation of 102F, which requires that only the true inventor of the application is entitled to a patent. But the office did not suggest correcting inventorship or any change. They said, school's out. You can't have the patent. Right, so 102F provides that a person shall be entitled to the patent unless he himself- he himself did not himself invent the subject matter sought to be patented. So here Mr. Verhoff- They didn't know that. Did not himself invent the subject matter. They didn't know who invented what. They had no evidence. They conducted no proceeding, neither a derivation proceeding, nor an old fashioned interference. They just said that there's an issue here. And since there's an issue, you can't have the patent. Right. Is it your argument that Mr. Verhoff, out of his own mouth, said that the inventive entity consisting of he alone did not invent the subject matter? Right. As I said, Mr. Verhoff himself presented the Patent Office with the evidence within his declaration, which he admitted that someone else conceived of the Paul lube in his own flagging of the PTO to the other application. He himself admitted that he wasn't the correct inventor. And, I mean, the PTO- There is an inventorship correction which could take place if that was what he wanted to do. The PTO isn't obligated to correct the inventorship for the application. You're saying that he had remedies. Correct. He could have filed to add her as an inventor. Right. Or he could have done, as he previously had done, he could have abandoned his application and filed another application jointly, which they had already done and contemplated. Now, in terms of the timing of this application, were interferences still possible? This application was filed in 2011, so it is pre-AIA, so there were still derivation proceedings and there could have been, you know, the office could have gone that route, but here it wasn't a question of deciding the priority. The question was that based on the facts provided by Mr. Warthoff, he was not the sole inventor. In other words, it wasn't a question of who did it first. Right. It's a question of whether he was the sole inventor or whether it was a joint inventive entity and he could have added her. Correct. And he did, in fact, when he originally filed his application, he did add her. They filed declarations stating that they were both inventors. They, you know, they filed an application together saying that they were joint inventors and they later, Mr. Lube later abandoned that application. But the question here is, is he a sole inventor, not a question of derivation or priority. Well, there's a more fundamental question as to conducting an appropriate proceeding at which information is adduced. If this was before the AIA, then an interference would have been available and with the knowledge and information that there was a similar or identical pending application. And if it were not before the AIA, then we have the successor provision, which is also designed to provide a formal structure of not hypothesis, but of bringing out the facts of inventorship. Instead, it seems to me that it's very curious just to reject an application for having the wrong inventor without doing anything to ascertain how with the law. We know that people can make suggestions. There's also a question of what's in the claims and what isn't. The original structure, I gather, was a commercial product. Maybe those people are inventors. Maybe the dog had a role in this. It's really curious to me to see this kind of total rejection of the application because there is a question, a legitimate question, about inventorship instead of all of the other ways that over the decades have tried to figure out inventorship. The PANU case, which the PTO relies on to talk about how a contribution just needs to be significant, that case was brought under, in validity, under 102F. But that was also a 102F issue. 102F was the basis for the interference practice until interferences were canceled. But if this application is subject to the grandfathering, then 102F is the basis for declaring an interference, not saying, I reject your application. Right, but the PANU case also talks about invalidity under 102F because of determining if someone is a sole or joint inventor. So this is a slightly different procedure where it is talking about sole... With no proceeding, no formality, no evidence from the other side? Mr. Verhoff did provide declaration evidence, and he had the opportunity to provide as much evidence as he can. I mean, here the facts are not in dispute.  The successor derivation proceeding, which perhaps doesn't apply, also provides for evidence not saying, there's a problem here, and this is how I decided. The evidence and the facts are not in dispute. Everyone agrees on what happened. Everyone agrees that Dr. Lamb conceived of the figure 8 loop, and that conception is part of inventorship. Everyone agrees? Did she agree? Did she testify? Well, she, by filing a joint application and signing a declaration, and then later filing her own application, agrees that she was a joint inventor of the application. What's the status of her application? Her application was abandoned. She did not respond to a rejection. It actually was rejected under a different art than Mr. Verhoff's, but her application is currently abandoned. The last point I wanted to make was about the Morse case, which is an interference. In that case, it wasn't a determination of sole inventorship or joint inventorship. The board in that case actually said that the inventors might be joint inventors, but that wasn't what they were determining. They were determining the interference proceeding. So the Morse case also doesn't stand for the proposition that if you maintain intellectual domination, you are guaranteed to be a sole inventor. It only says that maintaining intellectual domination may lead to, you know, depending on the facts. And here the board found that Mr. Verhoff didn't maintain intellectual domination. So it's not that… Was Morse an interference? It's an interference case by the board. By the board. Yes. Not binding on us. Not binding on you, that's correct. But since Mr. Verhoff or Mr. Lupe addressed it, I just wanted to point out that the board did address it and found that Mr. Verhoff did not maintain intellectual domination and the facts of that case are distinguishable over it, and it doesn't say that maintaining intellectual domination guarantees that you can be a sole inventor. Unless there are further questions, I'll yield the remaining of my time. Mr. Lupe? Thank you, Your Honors. First thing I'd like to clarify is just to go back kind of in history and talk about the joint application that was filed in October of 2011. And at that time, both Dr. Lamb and Mr. Verhoff swore out a declaration saying that they were joint inventors. And that was their understanding. Later, a couple months later, Mr. Verhoff, who had control of that application, abandoned that application and filed his own application. This is the December 16th date. And he swore out an application or a declaration, you know, attesting that he was…believes that he's the sole inventor. He sits here today and he still believes he's the sole inventor. And on that exact same day, Dr. Lamb similarly filed the exact same application that she got from Mr. Verhoff, happened to be on the same day, and she swore out a declaration that she was the sole inventor. They both had earlier said that they were joint inventors, but then later said that they were sole inventors. Now, I can't speak to Dr. Lamb on why she did that. I can only speculate. But the reason that Mr. Verhoff filed an invention, the application in his own name, is because he became better informed of the law. And he does believe that this, you know, Moresby-Porter, maybe not controlling on this court, but it was a wise decision. And it is very analogous to this case. In fact, we think that the fact pattern is most similar to this case. And in that case, you had a prospective inventor adopt the idea of someone else. And the court held that you can adopt an idea if it's freely suggested to you by a friend, a hired consultant, you know, we think that she was a hired consultant, or somebody that you know. And so we think that this case is most like that. We also think that it would be bad public policy to deprive him of his invention. I mean, it's true. He could go back and correct it, but he won't, because that's not what he believes. But presumably, he could add her as an inventor, and there would be a draconian result. Because we know that as joint inventors, they can both exploit the invention. And there's no remedy for him. Because under patent law, unlike copyright law, both inventors are free to exploit and commercialize the invention. So it's important to him that he be the sole inventor. So that's kind of why we're here. And we think that this is an important case. And, you know, I encourage you to look at our briefs closely. And we're right. The facts aren't really in dispute. And the law is pretty well settled. But the question here is, should he be deprived of his invention because he made a mistake and filed as joint inventors when he later became informed of the law and believes himself to be a sole inventor, set forth the reasons in a declaration, and wants to get his patent rights as he believes he's entitled to? Okay. I guess we have the argument. Okay. If there's any further questions. I think we're okay. Thank you very much. Thank you both. The case is taken under submission. That concludes our arguments for this morning. All rise.